All right, our next case is 20-1259 St. George v. City of Lakewood. And before we get started, we appreciate the CU Law's support of these types of efforts to provide representation out there. Mr. Cushing in particular, I appreciate that. We've had cases from your clinic in the last year or so. So again, I compliment you on your ability to put the program together. And as I understand it, our first lawyer for the appellant, Mr. St. George, is Danielle Trujillo. Is that correct? You may proceed, Ms. Trujillo. Thank you, Your Honors. May it please the court, my name is Danielle Trujillo and I, along with my co-counsel, Mr. Neil Sandu, represent appellant Mr. Eric St. George. Our supervising attorney, Mr. Matthew Cushing, is on the line and available should questions arise. With your permission, we would like to reserve three minutes for Mr. Sandu on rebuttal. Fundamentally, Your Honors, this case asks us to determine whether a pro se plaintiff pleading plausible facts in a highly factual specific analysis can proceed past this threshold procedural bar. Because the district court erred in failing to liberally construe his pro se pleadings at this preliminary motion to dismiss stage, the answer must be yes. Foremost, Mr. St. George alleged sufficient facts to succeed on each of the three Graham factors and all four of the subsequent Larson factors. The first Graham factor, severity of the crime, weighs in his favor because this court's jurisprudence demonstrates this factor is more than just the crime as initially reported. For example, in poly two, this court found that the first factor weighed in the poly brother's favor because by the time officers arrived on scene and had conducted their own independent investigation, they concluded one, no exigent circumstances existed and two, they did not have enough evidence or probable cause to effectuate an arrest. Despite Agent Trimmer's contentions, we do not need to assume that the crime as initially reported had in fact been committed. Rather, we look to poly two, this case is more like poly two than it is Morris because here Agent Trimmer does not contend that she had a probable cause. In Morris, the officer in that case mistakenly believed that he had probable cause and as such, this court assumed that the crime had been committed. Let me interrupt here. Certainly, the officer who was an officer, Brennan, was able to actually communicate with Mr. St. George and he identified him as a police officer and what instructed him to come out of the apartment. At that point, Mr. St. George might have known that there was a citizen police encounter. They were investigating a reported crime and at that point, things of course escalated from there, but at that point, wasn't Mr. St. George on notice that he was a subject of a criminal investigation, put it that way, and had some duty to cooperate? No, Your Honor, he was not on notice and for two reasons. First, as he alleged in his complaint, Mr. St. George had been subject to a variety of complaints before, but he expected that officers investigating a crime would have identified themselves physically. They would have knocked on his door. They would have made themselves visible by turning on their squad lights or by showing them that in fact, they physically existed and the second reason why he was not on notice is because even after Mr. St. George attempted to confirm the identities of these blocked, unknown, and threatening callers, the officer still did not identify themselves physically. Rather, we see from the record three separate times when Mr. St. George stepped out of his dwelling to confirm these identities. Each of these times, the officers witnessed him do so and yet they still refused to identify themselves. Didn't he have a weapon? He had a weapon the third time he stepped out, Your Honor, and at this time, he still was operating under a different set of facts. In fact, we can look to the fourth Larson factor and in Mr. St. George's manifest intentions, it would have been reasonable for the officers to conclude that his actions were impacted by what he thought were blocked, unknown callers, at best, prank callers, at worst, individuals connected with the incident that had occurred earlier in the evening. It's going to be an objective standard from the vantage point of the officers under both Graham and Larson, right? Absolutely. Whether he thought it was a gang after him or people associated with the escort, he may have truly subjectively thought that, but the police don't know that. We're not asking you to examine his inner thoughts in this case, Your Honor. Rather, his manifest intentions were illustrated in the words he spoke and the actions he took. He specifically said to the police, you aren't out there, after he had already tried to confirm their identities. And we can look to this court's holding in poly two, where this court confirmed that it was reasonable for the officers in scene on in that case to determine that the poly brothers took the actions they did because they were worried and frightened in the middle of night in the middle of the night, that these individuals arriving on their personal property were connected with the incident that had occurred earlier in the evening. And in fact, the, like the poly brothers, it was legal for Mr. St. George to arm himself to defend his property under Colorado state law. So this fourth manifest intentions factor weighs in his favor further. Let me ask you a couple of questions. I just want to make sure I get them in because they're important facts and I haven't been able to discern what they are in the record. I've looked at the exhibits. It looks like a duplex as he came out around with the shotgun. Would he have gone behind the truck behind which, uh, tremor, I guess it was what was, or would he have gone the other direction in front of the truck? So as discerned from the complaint, your honor, he walked in the opposite direction around the other way before even coming to agent tremor. So it was in front of the truck. So would he have seen her by his natural course of his natural route? No. And he did not see her as alleged in the complaint. All right. Second, second question is, did she fire from underneath the truck by the tire? That's a more difficult question based on the pleadings, your honor. And perhaps that's one that we could answer if we proceeded past this procedural bar, which is the motion to dismiss. Well, he struck in the leg and that's all we know. Yes. We know that agent tremor fired immediately after seeing him, but we know that she had six minutes from the time when he stepped out of his house and he fired his warning, a pump action. She had six minutes at that time to identify herself. And yet she still chose not to, what we do know is that the presence of his weapon alone, especially for Larson factor too, is not dispositive in this case. We can look to this court's holding in Wilson versus weeks for the proposition that the presence of a weapon alone does not satisfy the reasonableness inquiry. How many other officers were physically present at the time the shot was fired for shot? Yes, your honor. So agent tremor and three other officers were still on scene and they were uniformed. I presume they were, and they were in marked squad police cars. So their police cars were parked outside of the private residences gate. So at that time, there was no way for mr. St. George to have discerned that those police cars actually existed. And that's alleged in the complaint as well. Okay. Rather when we have this weapon involved, despite agent tremors contentions, we can't rest on a weapon alone. It's the actions that mr. St. George takes with the weapon that controls the analysis. We can look to the fourth circuits holding in Cooper versus she hand, which found that it was unreasonable for an officer to use force. Even though the plaintiff in that case was holding a weapon because the weapon was Further the plaintiff in that case did not make verbal threats to the officer. And here too, we see no verbal threats. Rather what we have is mr. St. George sitting in his private residence, drinking a glass of wine, scrolling on the internet. After he just went to dinner, we know that the officers have arrived on scene and we know that they have been there for over two hours trying to corroborate the initially reported crime, but they have one no exigent circumstances and two, no probable cause because after their independent investigation, they interviewed witnesses and witnesses confirmed. They did not hear gunshots. They searched for shell casings in the street and they did not find any rather. What we know is that even the crime as initially reported had not been confirmed. And finally, especially in regard to the procedural posture of this case today, your honors on this motion to dismiss what we know is mr. St. George did not need to succeed on all of the Graham factors and each of the four Larson factors. But what he did do was plead plausible facts to state a claim. The district court erred in not giving weight to the finding that the third Graham factor clearly went in his favor. And the first Larson factor did so as well. When liberally construing his pro se pleadings, the district court had enough evidence in the pages and pages of the complaint to see that the officer's actions on scene were in fact motivated by much of the context that they themselves had created by failing to identify themselves over the course of multiple hours, by failing to warn Mr. St. George before they shot him on site. This conduct should be considered in the analysis as this court has found repeatedly first in Sevier, then in Allen, then in Jerome, then in Polly too. It's the officer. Are those the cases you rely on that this was a clearly established constitutional violation? Yes, Your Honor, in total, but also Polly too is very clear on the matter that the reckless conduct of the officers on scene does in fact contribute to the analysis of what the objectively reasonable officer did. And the recklessness was the failure to physically present themselves to Mr. St. George? Yes, and that was the same recklessness that this court examined in Polly too, as well as the Fourth Circuit in Cooper versus Sheehan. And with your permission, Your Honors, I would like to reserve the rest of my time for Mr. Sandhu on rebuttal. Thank you. Good clock management. Okay, let's hear from Mr. Mead then. If it pleases the court, is the system working? We can hear you. Can you hear me? Can you see me as well? You may proceed, yeah. Thank you. If it pleases the court, Malcolm Mead of the law firm of Paul and Evans, bar number 11684 for the dependents at Belize. And before going further, allow me to commend the law students from the University of Colorado, Boulder School of Law, who are currently representing Eric St. George. Judging from the quality of their work, both on the brief and now in presentation, they clearly have bright legal careers ahead of them. No doubt about that. We concur with that. Yes. The Graham and Larson factors provide a convenient way to analyze a claim of excessive force. But when using these factors, you must be careful not to let the analysis become too mechanical. The central question in this case is whether a reasonable officer on the scene, considering the totality of the circumstances, would have had probable cause to believe her life was in immediate danger, thereby justifying the use of force. Remembering that officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and undoubtedly evolving, let's look at the totality of the circumstances known to Agent Trimmer. A woman calls the police at about 10 p.m. and reports that she was sexually assaulted and that the assailant followed her with a gun and fired two shots, one into the air and a second at her. Is that right? I thought it was that she had said there was illicit sexual contact, not that she was sexually assaulted. In other words, she was acknowledging that she had been an escort that evening. I apologize, Ron. The exact phrase could have been illicit sexual contact, correct. But she also reports that the assailant followed her with a gun and fired two shots, one into the air and the other at her. From this, the police have grounds to suspect four things. One is the report of illicit sexual assault. The other is the man possesses a gun. The man is going to use the gun to frighten or intimidate and the man may have attempted to kill the woman, fired the gun at her. In fact, the complaint in the opening long paragraph says she reported attempted murder. The police go to the man's apartment complex at around 10-15 p.m. and before making contact, they conduct a preliminary investigation. They talk to the man's neighbors. Several say they heard one loud sound. One neighbor said it sounded like a firecracker or a car engine backfiring, but not like a gunshot. So this part of the investigation is mixed. The neighbors heard a loud bang, which may or may not have been a gunshot. The officers also search the parking lot for bullet shells and find none. But this does not debunk the woman's 911 call, as plaintiff says. It'd be difficult to find two small bullet shells in the parking lot of an apartment complex during the day, but this is nighttime. And the illicit sexual contact happened inside the apartment, so there'd be no evidence of sexual contact in the parking lot. As a result of the investigation, the officers can neither confirm nor disprove the woman's report of being shot at and illicit contact. If you'll excuse me a moment, your honor, I'm still not used to the dry air of Colorado. So the officers take their investigation to the next level. They call the suspect on the phone and try to talk to him while remaining hidden for their safety. This is proper police procedure. They're trying to communicate with the suspect from a safe position without doing anything that would provoke a violent response. Plaintiff does not answer the first couple of calls, saying later that the caller ID was blocked. Plaintiff answers the third call, and the police say, this is the police. Please come outside and talk to us. The officer placed that phone call reports that plaintiff is upset, unsettled, and paranoid. Plaintiff opens his front door, looks around, doesn't see anyone, and closes the door. The complaint does not say that he stepped outside at that time. It just says he opened the door and looked around. Plaintiff says... How about at that point the police turning on their, you know, lights on the squad car? At that point, if they turned the lights on the squad's car, they could have agitated him at a point where he could still jump back inside and obtain a weapon, as he did still after the third phone call. They want to remain hidden until he's out, sufficiently outside of the apartment, that he can't go back inside and arm himself with a shotgun, as he did, unfortunately. Well, hidden to do what? I know that there's something in the record about one of the officers saying to grab him. They wanted him to come outside so they could grab him, but they have no basis to grab him, do they? Correct, Your Honor. Let me make two points on that. Those allegations in the complaint are an attempt by the plaintiff to state something about the state of mind of the police, which I do not believe constitutes a valid factual assertion in the complaint. Well, I'm just trying to figure out what were they doing. It seems to me like their conduct is not typical police behavior and will end up in this exact same result, more often than not, which is a citizen is shot when it didn't need to be. Well, actually, Your Honor, in the case of Allen v. Muskogee, this court discusses what is proper police procedure in this kind of setting. I believe they were responding to a domestic violence call, but the proper procedure is should remain hidden for their safety and try to contact the plaintiff in a neutral manner. A telephone call is a neutral manner. You don't want to cause the suspect to become more agitated than he already is while you're making contact, as unfortunately happened last year or two years ago, January 2019, New Year's Eve in Castle Rock, where the Castle Rock Police Department sent Sheriff Dennis Parsons to investigate a complaint of domestic disturbance in an apartment complex. He did what plaintiffs say he should do here. He walked up to the front door and knocked on the front door. And sadly, he's no longer with us. He was blasted by a rifle through the door. So that is improper police procedure. As even this court has said in Allen v. Muskogee, the worst thing that police can do is walk up toward the house or toward the front door and knock on the door in the middle of the night, because it's just accepted that that scares whoever's inside the house. So you don't want to try to force yourself into their domestic domain, their house, until you've made neutral contact with what they were trying to do. Let me take it from a different perspective. It seems to me everything they did was perfect for making the plaintiff think that there were some people out there who wanted to get him and were claiming to be police. They said it over the phone, but they wouldn't show their faces, do anything when he walked in front, even though he didn't have a gun at that time. There would have been no danger in showing up at that point. If he then darted back in the house and might get a gun, then perhaps they should hide again. But I know we're not supposed to look at the subjective state of mind of the plaintiff. And maybe we can't even base liability on a claim that the officers were reckless. But we can say that a reasonable officer would appreciate what they had been doing, what the person in the house would likely be thinking at that point. And they shouldn't fear him. And they shouldn't just let him walk around for six minutes and then shoot him. It just seemed like a remarkable incident. So my bottom line is, what do you think the officers should have thought the person in the house should be thinking after the officer's behavior? Calling, saying come out, and then not identifying themselves when he opens the door and shows himself without a weapon, etc. What should they have thought? Your question has so many layers, Your Honor. I'm not sure where to begin. That's why I was trying to put it in context. But my question is, what should the officers have thought was going on? And whether the person in the house would be getting very paranoid about who's outside. Okay, let me point out, part of your question, I think hinges on the allegation that when the police called, and when the plaintiff answered the phone call, and the police say this is the plaintiff, and the complainant says the caller ID was blocked. He never says the police knew that. Agent Trimmer did not make the phone call. Agent Trimmer does not know the caller ID is blocked. So as far as Agent Trimmer knows, the police have probably identified himself. Yes, the other officers have understood. Is there evidence that the police, when they call you, their number shows? Do we know one way or the other? No, we do not, Your Honor. Don't know. My position would be even if the caller ID was not blocked, all you're going to get is a phone number for the police department. You're not going to get named Sergeant Means on the phone. Give me a phone number. Unless he has the number memorized. He's still not going to know who's calling. Okay. The second point is, if plaintiff really believes that the people who say we are the police or the phone are not the police, he has a very peaceful remedy. Stay inside your apartment complex and dial 911. Call the police and say someone is outside impersonating the police and threatening me. Not that they were threatening, but he's scared of them. He thinks there's trouble outside. Did they suggest that to him? Because obviously he's in a little bit of a state inside, wondering if he's about ready to get run and they'll verify it. That allegation is not in the complaint, Your Honor. No. Well, it didn't happen, right? Correct. No. Instead of doing the reasonable thing, he grabs a shotgun and goes outside on the hunt. This is not like Polly case where the suspects remained inside their house and were afraid of an imminent invasion. In Polly, the police said, we're coming in, we're coming in. The plaintiff thought somebody's coming inside the house. The police here never said we're coming in. They said, please come outside with nothing in your hands. In response, plaintiff says, I have something in my hands, which in context is a threat. He's taunting the police. And then up the next phone call, he does come outside armed with a shotgun. The police said come outside with nothing in your hands. Instead, he comes out armed with a shotgun, a very deadly weapon. And then what does he do? He pumps the action loudly enough so that anyone in the house can hear the shell being ejected. That is a threatening gesture. He is manifesting an intent to go on the hunt after whoever is outside. I apologize for one more delay. Did the police have probable cause to make an arrest when they arrived at the apartment? They did not, and nor is that required. Under Morris v. No, probable cause is not an element of an excessive force claim under any law. And the first ground factor focused on the severity of the crime at issue. It doesn't say the severity of the crime for which you have probable cause to make an arrest. It's the crime at issue. If you are intending to make an arrest, you'd need probable cause. If you don't have probable cause, plaintiff has to claim for unlawful arrest. There's no claim here for unlawful arrest. The claim here is excessive force. In Morris v. No, this court explained that all the police need, what plaintiff has shown in the claim of excessive force, is a lack of grounds to do what the police were doing. In Morris, it was making an arrest, but here, they were on the scene to do an investigation, to make, if necessary, an investigatory stop or a terrorist stop. To make a terrorist stop, you don't need probable cause to make an arrest. You just need reasonable grounds to suspect a crime was committed. They had reasonable grounds based on the 911 call. And the crimes that were at issue, back to the first ground factor, are very severe crimes, including attempted murder. So the police have reasonable grounds to suspect attempted murder at the time they begin their investigation. That all changes when, after plaintiff is asked to come outside with nothing in his hands, he comes out armed with a shotgun, pumps the action of the shotgun, and then goes on the hunt. At that point, Agent Trimmer begins to have reasonable grounds to fear for her own safety, and that fear increases as he walks closer and closer to the pickup truck, to the point where he has a second to decide what to do. Should she stand up and say, I am the police, and risk being blasted with a shotgun? Or does she shoot to defend herself? She fires a shot in the leg out of self-defense. At that point, she had reasonable grounds to fear for her safety. Could any of the officers have identified themselves during the six minutes without endangering themselves? Not without endangering themselves. At that point, he's armed with a shotgun, manifesting intent to use it, if he sees someone, presumably. At that point, nobody can step out of a bush and safely say, I'm the police, without risk being shot. That's why Sergeant Maines does not interrupt the proceedings. Plaintiff says Sergeant Maines, during this procedure of walking around the building, should have stepped outside and said, I'm the police, don't go shoot Agent Trimmer. Well, at that point, Sergeant Maines would have exposed himself to being shot. The guy is armed with a shotgun, which he has pumped loudly to say, it's live, it's loaded, and I can use it. And the report is, he already tried to use a gun against the escort early in the evening. So the police are investigating a serious crime, and the man has now escalated the thing, the situation, by coming outside, armed with a shotgun, pumping the action shotgun, and walking toward where he's outside. All right, counsel, thank you. Your time's expired. We have some rebuttal time left, and that's for Mr. Sandhu. Your honors, may it please the court, on rebuttal, I'd like to focus on the element of danger. First, there was no danger when the officers arrived on the scene. I point you to page 184, paragraph 16.5, when the officers admit there was no imminent threat to themselves. Turning instead to the idea that there was danger when they're surrounding the house, this case has already been distinguished from active shooter cases by Judge Hart's opinion of Valverde versus Dodge. Valverde concerned a situation where an officer was coming around a car to a plaintiff who had a gun in his lap, and who had already engaged with serious crimes. Judge Hart said that that case was distinguishable by parenthetical alone from Cooper versus Sheehan, which involved a case where officers failed to identify themselves, had created disturbance at night on a victim's property, and the individual plaintiff came out with a shotgun to investigate. Clearly, by that line of cases and poly, cases in which a plaintiff comes out with a gun, not pointing it at officers, but merely to investigate a disturbance, does not render this a case of officers being in danger by any means. Finally, I'd like to turn to the issue of recklessness, which again, I'll rely on Valverde, Judge Hart's opinion. Judge Hart said in that case that it would be reckless in some scenarios for officers to not announce themselves when they arrive on scene, and the plaintiff doesn't believe the police are the one engaging with them. Specifically, it would be reckless to not announce yourself when the police knew that the individual they were dealing with was emotional or disturbed. It was clear in this case that Eric St. George did not believe it was the police who had contacted them. In fact, Sergeant Mueller communicated this point over the radio, so all officers, including Agent Tremor, were aware of this. Despite this, Agent Tremor and the rest of the officers took panes to disguise themselves and approach the house without announcing their presence. These panes specifically were hiding their cars around the block, not turning their lights or takedown lights on, not announcing their presence, and to your judge's earlier questions, not announcing their presence or grabbing Eric St. George when he walked out of the house. Eric St. George conformed with the officer's demands on three separate occasions. On the first call, he came outside with nothing in his hands. On the second call, he again came outside with nothing in his hands. In fact, the officer said the only thing in his hands was a cell phone. On the third call, he did walk outside with a shotgun, but two points on this before my time concludes. First, it is Mr. St. George's right under Colorado law to both hold a weapon and defend his house against intruders. Secondly, when Mr. St. George did realize that it wasn't intruders, but police calling his house, he laid down his weapon immediately. In fact, prior to that, he called the police after he'd been shot because he continued to believe that it wasn't police officers arriving at his door. It was people coming to exact revenge. Because the officers recklessly created the circumstances which led up to this, and because they used excessive force, we ask you to reverse the lower court and remand this case for further proceedings. Thank you. Thank you, counsel. We appreciate your arguments. Again, thank you, Mr. Cushing, for supervising the students. We always are appreciative to get these types of presentations. With that, counsel and student are excused. The case shall be submitted.